1

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

(1) JANELLE BRIDGES, et al.,      )
                                  )
        Plaintiffs,               )
                                  )
vs.                               )  No. 15-CV-126-GKF-PJC
                                  )
(1) KYLE WILSON, in his           )
individual and official           )
capacity,                         )
(2) MIKE REED, in his             )
individual and official           )
capacity,                         )
(3) MAYES COUNTY,                 )
                                  )
        Defendants.               )

DEPOSITION OF RICHARD KYLE WILSON, a witness called on behalf of the Plaintiffs, on the 1st day of August, 2016, at 1 Court Plaza, commencing at 1:28 p.m., in the City of Pryor, County of Mayes, State of Oklahoma, before the undersigned, Marlene Percefull, a Certified Shorthand Reporter in and for the State of Oklahoma.

_____
Marlene Percefull, CSR

DAVIDSON REPORTING
CERTIFIED SHORTHAND REPORTERS
5508 South Lewis Avenue
Tulsa, OK 74105
Phone: (918) 745-9959
DavidsonReporting@cox.net

EXHIBIT 1

```
 1              (Whereupon, the deposition began at
 2      1:28 p.m.)
 3                  RICHARD KYLE WILSON,
 4      having first been duly sworn to testify to the
 5      truth, the whole truth and nothing but the truth,
 6      testified as follows:
 7                    DIRECT EXAMINATION
 8      BY MR. MORTENSEN:
 9   Q  Could you please state your name for the record?
10   A  Richard Kyle Wilson.
11   Q  Mr. Wilson, how do you like to be called; Deputy
12      Wilson, Mr. Wilson?
13   A  Kyle is fine.
14   Q  Okay, Kyle.  Hopefully, I won't get too many
15      objections calling you "Kyle" but, as you know, this
16      is a rather informal setting.  We're in a conference
17      room at the county courthouse.  A couple of people
18      are present, Joe Norwood with me.  Again, my name is
19      Thomas Mortensen.  I represent the Plaintiffs in
20      this case, the Bridges family, regarding an incident
21      involving the shooting death of Shane Bridges on New
22      Year's Eve; do you recall that event?
23   A  Yes, sir.
24   Q  Okay.  Have you ever given a deposition before?
25   A  No.
```

| | | |
|---|---|---|
| 1 | A | The — burnout, small town, wanted a change. I had |
| 2 | | become very busy with a side job that I was doing |
| 3 | | construction-wise. |
| 4 | Q | Okay. |
| 5 | A | So I started doing that full time. |
| 6 | Q | What kind of construction? |
| 7 | A | About anything, remodel work to building housing |
| 8 | | additions to excavation work. |
| 9 | Q | Okay. While at Langley Police Department, did you |
| 10 | | ever have an instance where you had to arrest |
| 11 | | somebody? |
| 12 | A | Yes. |
| 13 | Q | On how many occasions? |
| 14 | A | A lot. I have no idea. |
| 15 | Q | Okay. Had you ever had an occasion where you had to |
| 16 | | use force of any kind on an arrestee or anybody |
| 17 | | else? |
| 18 | A | I would say that "of any kind" would be every arrest |
| 19 | | made, most. |
| 20 | Q | Fair enough. Could you go through maybe several |
| 21 | | different levels of force that you would have to use |
| 22 | | during an arrest so that me and you could have kind |
| 23 | | of a common understanding of what we're talking |
| 24 | | about? |
| 25 | A | It could be as simple as having, when you handcuff |

| | | |
|---|---|---|
| 1 | | somebody, you're touching them so, I mean, that's — |
| 2 | | some people consider that a level of force. |
| 3 | Q | Okay. |
| 4 | A | Then, you know, having to take somebody down to the |
| 5 | | ground that's not being cooperative. |
| 6 | Q | Okay. |
| 7 | A | I don't remember using any other force greater than |
| 8 | | having to take somebody down to the ground — |
| 9 | Q | Okay. |
| 10 | A | — in my career. |
| 11 | Q | Did you have stun guns there? |
| 12 | A | Yes. |
| 13 | Q | Did you ever use a stun gun on anybody, taser? |
| 14 | A | Not there.  I attempted to use my taser once.  I was |
| 15 | | one of the first ones in the State of Oklahoma to be |
| 16 | | certified to use a taser.  I was actually a taser |
| 17 | | instructor. |
| 18 | Q | Okay.  Where at? |
| 19 | A | Where at? |
| 20 | Q | Taser instructor where? |
| 21 | A | I actually received that training from Taser |
| 22 | | International itself in Oklahoma City. |
| 23 | Q | Okay.  Was that before or after this shooting event? |
| 24 | A | That was in the '99, 2000-ish, somewhere around |
| 25 | | there. |

1  Q   Okay.
2  A   It was before Tulsa, Oklahoma City, any of them had
3      tasers.
4  Q   Did you use a taser at Langley?
5  A   I carried a taser.
6  Q   Did you ever use one?
7  A   I pulled it out but I've never -- I don't recall
8      ever deploying, actually using it on a suspect.
9  Q   Okay. Did you have mace or pepper spray?
10 A   Yes.
11 Q   Have you ever used mace or pepper spray?
12 A   In the jail in Tulsa County.
13 Q   Okay. What about at Langley?
14 A   Unless it was on a dog or something, not on a
15     person. I don't recall ever using pepper spray on
16     anybody.
17 Q   Did you ever, at Langley, brandish your firearm and
18     point it at anybody?
19 A   Yes.
20 Q   Okay. On how many occasions?
21 A   I have no idea.
22 Q   More than ten or less than ten?
23 A   I have no idea. I don't know how to put a number on
24     that.
25 Q   Was that a common thing to brandish a firearm?

1    A    It would depend on the call.
2    Q    Okay. And when I say "brandishing a firearm," I
3         want to make sure that we have a common definition
4         here. What do you consider "brandishing a firearm?"
5    A    Either coming out with a long gun or taking it out
6         of the holster.
7    Q    Okay. And why don't we go a step farther and let's
8         say "brandishing" may be pulling it out and making
9         it available, pointing it at somebody might be
10        something different?
11   A    Yes.
12   Q    So how many times do you think you brandished a
13        firearm and pointed it at an individual?
14   A    I have no idea.
15   Q    Okay. Is that something that you would document as
16        a part of your duties at Langley Police Department?
17   A    No, if it did not escalate from there, no.
18   Q    Okay. Is there a way for me to research the exact
19        number of times that you brandished a firearm and
20        pointed it at somebody?
21   A    No, I could not think of one.
22   Q    All right. Would you say that you brandished and
23        pointed a firearm more than 100 times or less than
24        100 times?
25   A    I have no way of putting a number on it of any kind.

| | | |
|---|---|---|
| 1 | Q | Okay. I know you don't have, and I'm not going to |
| 2 | | be exact with you, I just kind of want your best |
| 3 | | guess. I'm not going to hold you to an exact number |
| 4 | | but best guess, more or less than 100 times? |
| 5 | A | I would probably say less. |
| 6 | Q | Okay. |
| 7 | A | But that would be a guess. |
| 8 | Q | Fair enough. I'm not going to hold you to that. |
| 9 | | All right. And when I say it on the record, I'll |
| 10 | | say it in front of anybody, too. I'm not going to |
| 11 | | hold you to that number, all right, just get a fair |
| 12 | | number. Could you describe your -- a common |
| 13 | | instance throughout these times that you did that |
| 14 | | where you would brandish and point a firearm at |
| 15 | | somebody? |
| 16 | A | Felony stops, building searches, searching looking |
| 17 | | for a murder suspect, searching inside a building |
| 18 | | for any high risk, you know, for serving search |
| 19 | | warrants. |
| 20 | Q | Right. And you happen to be in a building with a |
| 21 | | gun drawn out and if somebody happened to step in |
| 22 | | front of you that you're kind of pointing it at them |
| 23 | | and although you didn't mean to point it at that |
| 24 | | exact individual at that exact time, you were doing |
| 25 | | that for your safety, right? |

Deposition of RIchard Kyle Wilson 8/1/2016        Bridges, et al v. Wilson, et al16-CV-126-GKF-PJC

92

1   A   That's possible, right.
2   Q   Sweeping through a building and stuff like that?
3   A   (Nods head.)
4   Q   Felony car stops, sweeps of buildings, any other
5       instances?
6   A   Not that I can think of off the top of my head, no.
7   Q   Okay. At Langley Police Department, were there ever
8       any citizen complaints filed or alleged against you?
9   A   Not that I know of.
10  Q   All right. Throughout your time in your position as
11      a law enforcement officer, has anybody filed a
12      complaint or grievance or alleged that you acted
13      inappropriately in any fashion?
14          MR. GEE:  Object to the form.
15  A   I can only think of one.
16  BY MR. MORTENSEN:
17  Q   And when was that?
18  A   Now that you say that. A couple years ago maybe. I
19      don't know if he actually filed a complaint. I know
20      he called up to the sheriff's department and made a
21      complaint.
22  Q   Okay. And what sheriff's department?
23  A   Here.
24  Q   The Mayes County Sheriff's?
25  A   Yes.

```
 1    Q    All right.
 2    A    But he also called and complained about everybody he
 3         had contact with in law enforcement.
 4    Q    That happens sometimes.  What was his specific
 5         complaint with you?
 6    A    Had to do with something about taking his children
 7         from him, which I actually didn't do.  DHS took his
 8         children from him, I was just there.
 9    Q    Okay.  Do you know how that complaint was resolved
10         with the Mayes County Sheriff's Office?
11    A    I mean, it was an unfounded complaint.  I remember
12         the sheriff asking me about it and I explained to
13         him what happened.
14    Q    Okay.  And that's a good subject to kind of broach
15         into.  If a complaint were to come into Mayes County
16         Sheriff's, who would typically respond to that
17         complaint, talk with the citizen and talk with you?
18    A    It would be one of the supervisors.
19    Q    Okay.  You said in this instance, the sheriff
20         actually had a discussion with you about it?
21    A    Yes.
22    Q    Was that typical?
23              MR. GEE:  Object to form.
24    A    That's the only one I can remember that I've ever
25         had so I don't know if it's typical or not.
```

134

 1  BY MR. MORTENSEN:
 2  Q    Okay.  Would you still, to this day, call off
 3       backup?
 4            MR. GEE:  Object to the form.
 5  A    I would say "no," that if backup was coming, I
 6       wouldn't cancel backup until the situation was under
 7       control.  I had already been there and the situation
 8       was under control and no longer needed them.  At any
 9       rate, he never would have got there in time
10       regardless because he didn't cancel, he kept coming.
11  BY MR. MORTENSEN:
12  Q    Have you ever been a party to any civil litigation
13       before, whether that's a lawsuit or protective order
14       or anything like that?
15  A    I've served a lot of protective orders but I haven't
16       personally been, no.
17  Q    Any criminal cases, ever been arrested before?
18  A    Yes.
19  Q    For what?
20  A    A DWI that was dropped.
21  Q    Right.  Could you tell the record about when that
22       was and what county?
23  A    I was like 18, barely old enough to go to jail and
24       it was here in Mayes County.
25  Q    All right.  Is there a reason why you didn't list

Deposition of Richard Kyle Wilson 8/1/2016          Bridges, et al v. Wilson, et al16-CV-126-GKF-PJC

135

1          that on your CLEET application?
2     A    Because the charges were all dropped.
3     Q    Okay. But that was as a result of a probationary
4          sentence, correct?
5               MR. GEE: Object to the form.
6     A    No, I believe it was just dropped.
7     BY MR. MORTENSEN:
8     Q    You didn't enter a plea in that case?
9     A    To my recollection, it was just all dropped.
10    Q    Was it dropped after you went to court or before you
11         went to court?
12    A    I don't ever remember going to court for it.
13    Q    Did you have an attorney?
14    A    Yes.
15    Q    Who was that attorney?
16    A    Carl Longmire.
17    Q    And did he arrange some kind of deal for a reduced
18         plea on that case?
19    A    To my best recollection, it was just dropped. I
20         don't -- I don't know.
21    Q    Okay. Have you ever been suspended from any law
22         enforcement position or reprimanded?
23              MR. GEE: Object to form.
24    A    I don't believe I've ever been -- I don't recall
25         ever being reprimanded. My certification was