Janelle Bridges
7/20/2016                                                                 Page: 1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2             FOR THE NORTHERN DISTRICT OF OKLAHOMA

 3

 4
    JANELLE BRIDGES, et al.,        )
 5                                  )
         Plaintiff,                 )
 6                                  )
    vs.                             )  Case No. 15-cv-126-GKF-PJC
 7                                  )
    KYLE WILSON, in his Individual  )
 8  and Official capacity,          )
    MIKE REED, in his Individual and)
 9  Official Capacity,              )
    MAYES COUNTY,                   )
10                                  )
         Defendants.                )
11  _____)

12

13

14

15            DEPOSITION OF JANELLE BRIDGES

16            TAKEN ON BEHALF OF DEFENDANT

17            AT THE MAYES COUNTY COURTHOUSE

18                  IN PRYOR, OKLAHOMA

19

20               TAKEN ON JULY 20, 2016

21

22

23
    REPORTED BY:
24  Laura Lee Griffin, CSR #1215, One Court Place, Suite 210,
    Pryor, OK  74361
25
```

(405) 605-6880 instaScript
schedule@instascript.net

EXHIBIT 6

```
 1                      JANELLE BRIDGES,
 2   having been called as a witness on behalf of the defendant,
 3   after being first duly sworn, testified as follows:
 4                      DIRECT EXAMINATION
 5   BY MR. GEE:
 6       Q.    State your full name for the record please.
 7       A.    Janelle Lois Bridges.
 8       Q.    And have you gone by any other names?
 9       A.    My maiden name, Janelle Lois Crook.
10       Q.    Any other -- any kind of aliases or anything like
11   that?
12       A.    My previous marriage I was Janelle Lois Hayes.
13       Q.    Any other names?
14       A.    That's all.
15       Q.    Okay.  Have you ever given a deposition before?
16       A.    No.
17       Q.    Okay.  We'll go over some, we'll just call them
18   ground rules, they're more just guidelines to help us go
19   through this process.  One of the things we'll try to do is
20   avoid talking over each other because she's taking down
21   everything we're saying and we're trying to keep a clean
22   record; okay?
23       A.    Okay.
24       Q.    And so you're doing good this far but I'll ask you
25   to continue to answer audibly so head shakes won't work or
```

```
 1      Q.   More than ten?
 2      A.   I wouldn't know.
 3      Q.   More than 20?
 4      A.   I wouldn't know.
 5      Q.   Huh?
 6      A.   I wouldn't know.  There were just so many.
 7      Q.   Do you have any estimate?
 8      A.   No.
 9      Q.   Were all of those shots fired in rapid succession?
10      A.   Yes.  It was so fast.
11      Q.   Were you still in the west bedroom laying down when
12   you heard the gunshots?
13      A.   Yes.
14      Q.   Did you see anyone shooting a pistol?
15      A.   No.
16      Q.   Or any other firearm?
17      A.   No.
18      Q.   Do you know which shots came from what guns?
19      A.   I only heard one gun.
20      Q.   How do you know you only heard one gun?
21      A.   Because they all came from outside my window.
22      Q.   Okay.  Would you agree -- strike that.  All the
23   gunshots you heard were outside?
24      A.   Yes.
25      Q.   And you can't tell me whether there were more than
```

```
 1   ten shots?
 2   A.   There was just so many.
 3   Q.   I'm trying to figure out what you heard as far as --
 4   and just an estimate is fine, but did you hear 20?
 5   A.   I don't know.
 6   Q.   Less than 20?
 7   A.   I don't remember.  There was just a lot.
 8   Q.   Was there more than 50?
 9   A.   I wouldn't say that.
10   Q.   Less than 50?
11   A.   Yes.
12   Q.   Less than 40?
13   A.   I don't know.  There was just a lot.
14   Q.   So you don't know whether there was less than 40
15   shots fired that night?
16   A.   There were a lot of shots fired all in a row.
17   Q.   All I'm asking is at that time, after you hear the
18   door close or what you believe is the door closing, how many
19   shots do you estimate were fired?
20   A.   There were a lot.
21   Q.   So you can't put any number on it?
22   A.   No.
23   Q.   Not even an estimate?
24   A.   There were just a lot.
25   Q.   And you can't identify the gun or the guns that were
```

Janelle Bridges
7/20/2016                                                                Page: 110

```
 1   shot?
 2       A.   I heard from one direction.
 3       Q.   Do you have any training on recognition of gunfire?
 4       A.   No, I've just been around guns my whole life.
 5       Q.   Okay.  Well is there any way to identify what
 6   direction a gun is being shot?  Just by listening to it?
 7       A.   I just know what I heard and they all come from the
 8   same direction.
 9       Q.   I understand that but what I'm asking is are you
10   saying that when a gun is shot you can hear which direction
11   it's being shot?
12       A.   That night I could.
13       Q.   Have you been able to any other night?
14       A.   Yes.
15       Q.   Okay.  So if we were to go outside and shoot at a
16   range and you were to listen to it, you could tell me which
17   direction the gun was being shot?
18       A.   Well, if you're at a range, you're all lined up.
19       Q.   Okay.  Well let's say we're at a range that we can
20   shoot from about a 100 degree radius.
21       A.   Are we outside or inside?
22       Q.   We're outside.
23       A.   Outside is a little more difficult.  No, inside is a
24   little more difficult because it's all going to echo.
25   Outside would be easier.
```

```
 1     Q.   Could you identify which direction the gun was shot?
 2     A.   Yes, it was coming from the driveway outside of my
 3   window.
 4     Q.   And you just don't recall hearing any other shots
 5   being fired any other direction that night?
 6     A.   No.
 7     Q.   Can you identify what caliber guns were being shot?
 8     A.   No.
 9     Q.   Can you identify the difference between different
10   calibers that are being shot?
11     A.   Depends on what you're comparing.  If you're talking
12   about a shotgun and a .22, yes, you can tell.
13     Q.   Okay.  Can you compare a .357 to a .38 Special?
14     A.   No.
15     Q.   Can you compare or can you tell the difference
16   between a .38 Special and a .40 caliber?
17     A.   No.  I wouldn't be able to anyway.
18     Q.   Okay.  Can you tell the difference between a 40
19   caliber and a .45 caliber?
20     A.   I don't believe so.
21     Q.   I mean have you ever tried to?
22     A.   No.
23     Q.   At any time did you see any muzzle flashes?
24     A.   No.
25     Q.   At any time before any shots were fired did you see
```

```
 1    A.   He didn't do anything wrong.
 2    Q.   How do you know he didn't do anything wrong?
 3    A.   He never shot.
 4    Q.   And how do you know that?
 5    A.   I never heard any shots from him.  I heard shots
 6  from outside from one direction.
 7    Q.   And did you ever see anyone shoot that night?
 8         MR. MORTENSEN:  Objection, rather vague.  Could you
 9  specify when?
10    Q.   Yeah.  After you had laid down with S███, Jr., did
11  you see anyone shoot a gun?
12    A.   No.
13         MR. NORWOOD:  After that time?
14         MR. GEE:  After that time.
15    A.   No.
16    Q.   And you didn't see any interaction between Shane
17  Bridges and Kyle Wilson; is that true?
18    A.   Yes.
19    Q.   Do you have any knowledge as to the training,
20  supervision, that the Mayes County deputies receive?
21    A.   No.
22    Q.   Are you aware of any claims of excessive force
23  against anyone at the Mayes County Sheriff's Office?
24    A.   No.
25    Q.   What's your understanding as to whether Shane
```

```
 1    Bridges knew Kyle Wilson?
 2         A.    I don't know.
 3         Q.    Do you know anything about deputy Kyle Wilson's
 4    training?
 5         A.    No.
 6         Q.    Do you know whether before January 1, 2014, whether
 7    Deputy Wilson ever used deadly force?
 8         A.    No.
 9         Q.    Do you have any evidence or factual basis that
10    suggests that defendant Wilson had any ill will towards
11    Shane?
12         A.    I wouldn't know.
13         Q.    Do you have any factual basis that suggests that he
14    was out to get Shane?
15         A.    No.
16         Q.    Huh?
17         A.    No.
18         Q.    Do you have any knowledge as to whether Shane had
19    any criminal convictions?
20         A.    Yes.
21         Q.    Do you know what those convictions were for?
22         A.    Not exactly.
23         Q.    Do you have any -- do you know whether they were
24    felonies?
25         A.    Yes.
```

```
 1    A.   One.
 2    Q.   And when was that?
 3    A.   At a baseball game.
 4    Q.   Where was the baseball game?
 5    A.   Adair.
 6    Q.   And tell me about that interaction.
 7    A.   I was sitting in the stands watching my son play
 8   baseball and he came and sat next to me and I didn't realize
 9   who it was at first and then I looked over and I didn't know
10   what he really looked like before but I just knew for some
11   reason that it was him and I asked him, "Are you Kyle
12   Wilson?"
13        He shook his head yes.
14        And then I went on to tell him how he had ruined my
15   life and let him know that his dad is not there, that A▮▮▮'s
16   dad is not there to watch him hit this ball right now and
17   that my little baby doesn't know his dad and he never will
18   and I asked him can you please get up and go somewhere else
19   and he shook his head no and he wouldn't move so I had to get
20   up and leave.
21    Q.   Do you have any reason to believe that Deputy Wilson
22   wanted to take Shane Bridges' life?
23    A.   I don't know.
24        MR. MORTENSEN:  Objection.
25    Q.   Is there any other conversation you had with Kyle
```